A minor counsel, whenever you're ready, you may proceed. May it please the Court. Your Honors, Wesley Gozier here, representing CMLC on the case of Marion County. This issue comes before the Court based upon the trial court's ruling that CMLC failed to make reasonable efforts and failed to make reasonable progress in his juvenile case with his daughter. This order came and we believe it was against the manifest weight of the evidence at trial. The issues that brought the children into care initially were the issues of domestic violence between the father and the mother and alcohol abuse and substance abuse in general. All throughout the case, other than the very outset of the case in November of 2014, the case workers have found that CMLC had not been using alcohol, had not been using drugs, and he was actively taking the 48-week course of men challenging violence. We believe that as far as the failure to make reasonable efforts are concerned, that since this is a subjective standard, that CMLC was making progress and was making reasonable efforts by abstaining from drugs and alcohol and taking the men challenging violence course. In case workers, his initial case worker was Casey Beale and she transitioned to Beth Volk and from there to Kendra Shuler. All three of those case workers admitted that Mr. Samuel was not using drugs and alcohol but for the initial DUI at the outset of this case. In the first alleged time period, the first nine-month period, Casey Beale and Beth Volk were both the case workers and they stated that Samuel did start men challenging violence. He then transitioned to solely Beth Volk for the second nine-month period and during that nine-month period, Samuel had 30 of the 48 men challenging violence courses completed. Then he transferred to Kendra Shuler for the third time period and while she was the case worker, Mr. Samuel was fully discharged from men challenging violence after 45, not 48, courses. Carl Mannion, the men challenging violence coordinator testified that Samuel had been making progress and was making good efforts calling out other men during the men challenging violence courses and that they felt that he had done enough progress to graduate the course. Now throughout the time period of this case, there was the budget impasse and that negatively affected the availability of the men challenging violence course. Carl Mannion, the men challenging violence coordinator testified that she didn't recall Mr. Samuel missing many weeks in a row throughout this time period. So a lot of the reason that it took so long to complete a 48-week course was due to the unavailability of the course. Samuel was making reasonable efforts to take the course and he was making efforts to abstain from drugs and alcohol. Throughout the time period of this case, other than at the outset, there had not been issues of any domestic violence that Samuel had perpetrated and he had not been charged with any other drug or alcohol related occurrences. So from the outset of the case, the reasons that brought the children into care were the domestic violence issues and the substance and alcohol abuse issues and all throughout this time period but for the DUI in November 2014, Samuel was working to resolve those issues and successfully seeming to resolve those issues. Now as far as the failure to make reasonable progress, that's an objective standard and a measurable standard from the time that the children were taken to the end of the case. And at the time the children were taken, Samuel did have alcohol and drug issues, he didn't have domestic violence issues. He was taking steps from the point he hit rock bottom, which was when his kids were taken away and when he received that DUI, the only other place for him to go from there was up. He'd stopped the drugs and alcohol use, he'd stopped the domestic violence, he started taking the men's challenging violence courses and was successfully discharged from the program. If that's not measurable progress, I don't know what is. Sure, he did not meet everything that was on the service plans, but the reason the children were taken into care were the domestic violence issues and substance abuse issues. And we believe that the court wholly ignored those issues when ruling that Samuel was an unfit parent. Counsel, what were the issues that the court found that he didn't meet the goals? Your Honor, there were some issues that claimed that he wasn't keeping case workers up to date with where he was working, that he had a stable home environment. There were also claims that Samuel wasn't using the information he was learning in men's challenging violence and applying it to everyday life. From my reading of the record, it's pretty clear that the case workers and the guardian ad litem thought that Mr. Samuel was a jerk from the outset of this case. And I feel like they had clouded judgment against Samuel the whole time and just continually thought of him as a jerk. Carla Mead, the men's challenging violence coordinator, testified that she believed he was making progress. She was the only person who testifies who really did not have a lot of interaction with Samuel at the outset when he was hitting rock bottom. She just came into contact with him after he started the service plan, and she saw progress. So admittedly, he wasn't keeping up with some of the service plan issues, but all throughout this case, Samuel was employed, had good income. He just wasn't providing the documentation to the case workers, but the case workers testified that he had always worked. And specifically, Kendra Shuler testified that he'd always worked. So is this a perfect case? No. There were definitely issues involved in the case, and obviously when there is an adjudication of neglect, there are problems with the parents. However, Samuel was making reasonable efforts and reasonable progress on his service plan and hitting measurable goals throughout this case. However, it seemed that nobody seemed to care that he was making that progress. I defer to Mr. Hudspeth. Thank you. Thank you, counsel. Good morning, guys. My name is Tim Hudspeth. I'm the appellate counsel for the mother in this matter, Jessica C. Your honors, there were three time periods here at issue, three different relevant nine-month periods. As Mr. Goza stated, the reason for termination was lack of reasonable efforts and lack of reasonable progress. But I'd like to just kind of key on what my client did during each of those three nine-month periods and obviously address any questions that your honors may have. The reasonable efforts standard, that's a subjective standard. We need to keep in mind what the parents, where they are in their life, what circumstances and situations they're in. My client was a domestic violence victim. That's shown in the record. My client, after the children were taken from her, came to be known that there were substance abuse and mental health issues. Those are not items that she hid from or that she denied. Those are things that she addressed. In the first nine-month period, excuse me, being November 6, 2014 to August 5, 2015, there was a family service plan in place that initially had six broad general areas to be addressed, narrowed down to 17 items, individual items as I counted those. Casey Beale, Caritas Family Services caseworker, testified that during that first nine-month period, my client was working on substance abuse items and counseling. She was rated as successful on addressing her domestic violence issues as the victim, not as the aggressor, and that she was rated satisfactory on items pertaining to having a safe home, safe living environment. There was a second family service plan then that was prepared in May of 2015. At that time, she was rated as satisfactory on eight items. There were four new items that were added. She was rated as satisfactory on each of those four. There was one item that it appears was dropped or changed into something else, and there were eight additional that were unsatisfactory. So basically, by the end of the first nine-month period, satisfactory on 12, unsatisfactory on eight. In order to get any satisfactory rating, clearly she has to be making some efforts. Her caseworker acknowledged she's working on one thing. She is making those efforts. The second, also Ms. Beale, caseworker, said that at the time that the second family service plan was created, on the six general areas, my client was rated as satisfactory on three out of those six. So again, 12 out of roughly 21, and three out of six in the first nine-month period. The second nine-month period was from August 6, 2015 to May 5, 2016. The first check-in we have comes in May of 2015. I'm sorry, in November of 2015. At that time, there were eight items listed as being satisfactory. There were three items that actually had been dropped off because they were shown as achieved in discontinued intervention. So not only had my client been working on certain items, there were at least three that during that second nine-month period, her caseworker said, you're done with those. Don't worry about them anymore. In order to get to that point, again, she has to be making efforts. She's got to be doing something. And not only is she making efforts, the fact that several items were discontinued because the result was achieved shows that she's actually making progress. She's doing what they're telling her to do. There was then a testimony from another caseworker, from Beth Volk. She testified and responded as far as her living arrangements. She was temporarily residing with her parents in a safe home, and she was employed at McDonald's addressing financial needs and financial issues that the employer at the Carhartt House wanted to be addressed. Then, just after the end of the second nine-month period, May 5, 2016 is the end of that period, there was another family service plan prepared on May 18, 2016. So basically, at the tail end of the second nine-month period. At that time, Beth Volk, she prepared this family service plan, said there were 16 items that were rated as satisfactory. She didn't say 16, but the ones that she said were satisfactory, I added them up to 16, again with another three that were previously discontinued because my client had achieved those results. There were two items remaining that were shown as unsatisfactory, one of them being maintaining a safe home for children. Her testimony went on to say, in regards to the home, it was clean and it was appropriate for the past six months, there was no mention of any alcohol or drugs in the home. So I would submit that really there was another one that was rated as unsatisfactory, but actually should have been satisfactory. Again, my client is making efforts, she's progressing when things are being dropped off, when her caseworker is acknowledging, yes, you are in fact completing what we're telling you to complete. The final nine-month period was May 6, 2016 to February 5, 2017. During this time period, there's a second child that's not at issue in this case today, not AC. An older child. That child was actually taken from the home along with AC, was returned during this third nine-month period. In July of 2016. Beth Voelk, in her testimony, said that as of July 29, 2016, so in the middle of the third nine-month period, my client's ratings would be essentially the same as they were in May of 2016. That's when she had positive remarks, satisfactory on 16, 17 or so ratings, and several that had been dropped off. Now, all wasn't perfect. Admittedly, my client relapsed during this time period. But she didn't relapse and fall off the face of the earth. She didn't relapse and give up. There's testimony from Kendra Shuler. She was the caseworker from October of 16 to January of 2017. There's also testimony from Chevy Edwards. My time has expired. I thank you. Thank you, Counsel. Counsel? May I please record? Counsel, my name is Sharon Shanahan, and I represent the people of the state of Illinois. As this court knows, although the state may rely on several grounds in filing a petition to terminate parental rights, a filing adverse to the parent on any one of those grounds will support the subsequent termination. Now, as Counsel for the Mother alluded to, we have a mother, we have a father, we have reasonable progress, we have reasonable efforts, and we have three separate nine-month periods. So that's 12 different parts in which a finding of unfitness would support the grounds here. And then she added best interests. That's 14. So I don't have time to address 14 things here today. What I'd like to do with court's permission is I'm going to basically focus on one nine-month period for each parent, and I'm going to look at reasonable progress in that nine-month period. As you know, reasonable progress is an objective standard focusing on the amount of progress towards the goal of reunification that one can reasonably expect from the parent under the circumstances. It relates to progress towards the broadly defined term of the goal of the children to the natural parent. And this court is not limited to the conditions that were the basis of the removal of the child from the parent. So we have Counsel for the Father talking about, well, the only two things. Well, it's not only two things. As we view the case goes forward, other things can come up. Other serious conditions existing at the time the child is removed may become known only after removal. And the standard, and I think by which progress is to be measured, is parental compliance with the trial court's directives or the service plan or both. And this is standard review here is manifest weight. And I think when you look at the facts in this case, obviously like all of these cases it's a very fact-intensive case. None of these cases are where we say, oh, this case is like that case. These are all sui generis. So I'll begin following the same pattern as opposing counsel did and discuss the father. And I want to start at the very end of the second nine-month period since it's relevant to the third nine months. First of all, Samuel abandoned counseling. As of November 2015, he had not been seen by his counselor since June 2015. Now, that's not because counseling was not available. It's because he decided that since he was done with probation in his criminal case that he didn't need to come anymore. So he just was gone. This included his domestic violence counseling, which is the Men Challenging Violence, MCV, and it included his substance abuse. So 52 weeks into Men Challenging Violence, he had completed only 19 sessions. That's one-third of the required 48 sessions. And here's going to be my mantra here. He had not changed his demeanor towards women. He spoke in a degrading manner to his caseworker. He spoke to his own mother in a degrading manner. He spoke horribly of Jessica. He even spoke in a demeaning manner to the guardian ad litem. We move then into the third nine-month period, which is going to be my focus. He did finish Men Challenging Violence. It took him 104 weeks to complete a 48-week Men Challenging Violence. And that, of course, as I say, we had that big gap the previous year where he just quit on his own and didn't start again for several months. He did not obtain a mental health evaluation, which his counselor believed he needed. And this is very important because of Samuel's history of issues with anger and unstable behavior. He was working, but he would not give the caseworker his pay stubs. And this is kind of curious. He's got a new girlfriend. He's got a baby with the new girlfriend. He would not provide any, they couldn't even give him her name because he didn't want them to do a background check on her. And he said, oh, she's not that, he's not in a real relationship with her. But this was his boss's daughter. And he referred to this man as his future father-in-law. And yet he refused to even give the caseworker the mother of his new child's name. I'm going to go back to what I said was my mantra. He didn't change his behavior. He never showed, did he finish the class? Yes. But sitting in a room doesn't mean you learn something from it. He never showed any understanding about what he learned in those classes. He continued to display irrational and harassing behavior towards Jessica. According to Jessica, he threatened to kill her. Here's probably, I think, the saddest thing. We referred to, there was reference to the older boy, his name was Curtis. He put Curtis right in the middle of this situation with him and Jessica. He called Jessica a whore. Said that to his son. Your mother is a whore. Actually, I think he said it in a Facebook posting. But nonetheless, he conveyed that to his son. He just, he never, he didn't understand how his behaviors would affect the behaviors his son would learn from him. And then another mantra. One of the very first things that was required of both of these parents is that they weren't supposed to see each other. Because when they got together, they started drinking, they started fighting, the violence started. And he continued to see Jessica throughout. Moving on to the mother. Counsel for Jessica wanted to tell you about what Jessica did. I want to tell you about what Jessica didn't. Because really, that's what we're looking at here. What did she fail to do and was the trial court's decision when looking at what she failed to do sufficient to support a finding of unfitness? We see this in juvenile cases all the time, kind of roller coasters. They do better, and then they do worse, and then they do better, and then they do worse. Frequently we see an improvement about the time that the petition to terminate is filed. Because they think, oh my gosh, it's time to do something. But let's look at the third month period. Jessica had done better in her second month period, and she did as counsel for her notice to this court. She did so well that the court returned Curtis to her for nine days. Nine days. Why? Because she relapsed and was using illegal drugs, benzodiazepines, opiates, and amphetamines. Nine days after she gets her son back. Now, there was a counselor, she called herself a co-facilitator. She was not the psychiatrist or the psychologist, but I think she was involved in the, it was my impression from the record that she was in the group counseling. And she said that Jessica's greatest trigger was not having her children. Well, I have to think that we've brought into serious doubt that opinion. If nine months after she gets her son back, she relapses and starts using illegal drugs. She relapsed again in October of 2016. I have to tell you something about that first relapse. She didn't tell Mrs. Minor, the co-facilitator, that she relapsed. And she didn't tell her substance abuse and mental health therapist that she relapsed. I kind of forgot to mention that. Again, she relapsed again in October. In December, according to her counselor, she smelled horribly of alcohol. There were beer cans in her trash cans during the same time period. She didn't come to her counselor for any medication management that might help her. Although her counselor encouraged her to go to AA or NA, she didn't go. And the counselor testified at the hearing, no surprise to this, that an addict or an alcoholic will have a better chance of maintaining sobriety if they attend AA or NA. Now, right at the end, during the hearing, so we're past the last nine months, February, and the hearing was in May. So there is some testimony by the father and the mother that cover a period that's not in any of the nine-month period. But nonetheless, referring to Jessica's testimony at the hearing, she said that she was going to AA. But the trial court found it a little bit surprising that she couldn't recall when she last attended and she couldn't name one single AA step. I mean, that's AA. You work the program. You do the first step. You do the second step. If you're going, at least know the first step. And this was a point that the trial court mentioned in his order. In about the middle of this, middle to late part of this third nine-month period, her substance abuse counselor noted that she'd missed 10 out of the last 15 group appointments. And when she was asked why she missed these sessions, she said, well, it was difficult to get up. Or she was just sleeping in. And at the end of the nine-month period, the third nine-month period, she had not completed either group or individual therapy. She was unable to participate in parenting classes until she was compliant in her substance abuse and mental health counseling. So she couldn't start parenting until just a few days before the end of the third nine-month period. In October, she was again with Samuel. She lied to her caseworker about it. She continually violated the requirements to stay away from him. It was a condition of her probation as well as DCFS that she stay away from him. And even at the hearing, again, this hearing occurred three months after the end of the nine-month period, she said that she loves Samuel. And even after being told to stay away from him, if she wanted her children back, she snuck around and had contact with each other. And I'd like to kind of quote the trial court here. Jessica said that her tumultuous violent relationship with Samuel was somewhat dysfunctional. And the trial court said that that was an understatement which emphasizes Jessica's inability to grasp how her relationship with Samuel had prohibited regaining custody of the children. Now, as I said, she did do better in the last couple months of the nine-month period, right at the first of the year. But I think we need to note that the last time she did well and she got her son back, nine days later she's relapsed and is using illegal drugs and alcohol. So we can't learn anything. What we can learn from that is that she can't stay sober, even when she has the ultimate goal in her grasp. And her tardy efforts in these last couple weeks of the nine-month period make it impossible to learn appropriate parenting skills or truly apply the things that she learned. So for all those reasons, the state would ask that this court affirm the finding of non-fitness and release these children for adoption, her child. Thank you, counsel. Counsel? I just have a brief rebuttal. Since we were focusing somewhat heavily on that third nine-month period, it's important to point out that there was a permanency order entered July 20 of 2016, which was fairly early in that third nine-month period. That permanency order still had a return home goal and also indicated that Samuel had made substantial progress towards the return home of a minor child. There were some permanency orders entered prior to that that didn't note one way or another in regards to substantial progress. There were some that had noted that there had not been substantial progress. But it is important to note that there was a permanency order entered indicating that substantial progress had been being made. With that, if you have any questions, I'd love to entertain those. If not, I'll defer to Mr. Holmes, please. Thank you. Thank you, Your Honors. And just briefly, counsel for the state made reference to whether or not my client was kind of taking her obligations under the Family Service Plan serious. As it pertains to attending certain counseling classes. There's a Shelby Edwards who was a mental health and substance abuse therapist at Community Resource Center. She testified that my client's efforts in counseling were committed. Committed? Yeah. So what exactly does that mean? She didn't want to say. What does committed mean? It means she understands what she needs to do. She's working. She's making efforts. She's trying to do what's asked of her. I don't think in any scenario when there's counseling involved that we can expect that as soon as somebody starts going, let's say, to substance abuse counseling, that they're never going to have a relapse. That's to be expected. That's going to happen. What's important, though, is that the person after a relapse realizes, man, I made a mistake, and goes back to counseling and starts things back up and continues working to address that problem. Yes, my client, she had a relapse nine days after getting the other child back. Obviously, that's not the position she wanted to find herself in. But she continued after that working. Counsel for the State stated that early in 2017, my client started getting better and she started doing well. That shows she went back. She resumed the counseling that was required of her. There was also discussion about there's two parents, there's three time periods, and there's efforts and there's progress. So there's only one of 12 reasons to terminate parents' rights. The math is correct. I'll agree with that. But keep in mind, only six of those are going to apply to my client. And in my brief and in my arguments to the court today, I think I've shown you that during those six periods, my client put forth reasonable efforts. My client successfully completed certain items that were called for. She admittedly relapsed. But with several months to go in the last nine-month period, she got back working on things and was getting back to where she was at the time that her son was returned to her. It was also mentioned that there was a condition of probation that my clients and the father not be together. I just want to clarify that I don't believe that was my client that was on probation. I think that was a condition of the father's probation related to a domestic violence charge. I don't think there's anything in the record to suggest that my client was actually on probation. Your Honor, I think that the record shows the mother, Jessica, was doing what she could. She was a domestic violence victim. She had mental health. She had substance abuse issues. Those are not things that are going to stop on a dime. Those are things that are going to take time. Admittedly, she had three nine-month periods. I think that the record shows she started on the first nine-month period. She really got in gear during the second. She fell back late in the second, early in the third. But then at the end of the third, she's coming right back, and she's doing good again. That's what we should expect of these parents, that they're trying and that they're progressing. Thank you, Your Honor. Thank you, Counsel. We appreciate the briefs and arguments of counsel. We appreciate the way the two of you split the time, too. And we'll take the case under advisement, issue an order in due course. We've finished the morning.